1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         SOUTHERN DISTRICT OF CALIFORNIA
10

11   SHELLEY S.,[1]                          Case No.:  22cv1499-LR
12                            Plaintiff,
                                              **ORDER REGARDING JOINT
13   v.                                       MOTION FOR JUDICIAL REVIEW**
14   MARTIN O'MALLEY,
     Commissioner of Social Security,[2]      **[ECF NO. 20]**
15
16                            Defendant.
17

18        On October 3, 2022, Shelley S. ("Plaintiff") filed a Complaint pursuant to 42

19   U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

20   Security ("Defendant") denying Plaintiff's application for a period of disability and

21   disability insurance benefits.  (ECF No. 1.)  The parties consented to Magistrate Judge

22   jurisdiction.  (ECF No. 8.)  Now pending before the Court is the parties' "Joint Motion"

23

24

25   [1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), the Court's opinions in Social Security cases filed under
     42 U.S.C. § 405(g) "refer to any non-government parties by using only their first name and last initial."
26

27   [2]  Plaintiff named Kilolo Kijakazi, who was the Acting Commissioner of Social Security when Plaintiff
     filed her Complaint on October 3, 2022, as a Defendant in this action.  (See ECF No. 1 at 1.)  Martin
     O'Malley is now the Commissioner of Social Security, and he is automatically substituted as a party
28   pursuant to Federal Rule of Civil Procedure 25(d).

seeking judicial review.  (ECF No. 20 ("J. Mot.").)  For the reasons discussed below, the final decision of the Commissioner is **REVERSED**, and the case is **REMANDED** to the Commissioner for the **CALCULATION AND AWARD OF BENEFITS**.

## I.  PROCEDURAL BACKGROUND

### A.  Initial Proceedings

On February 7, 2013, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning on December 15, 2011.  (ECF No. 12 ("AR")[3] at 126–27.)  After her application was denied initially and upon reconsideration, (id. at 39–51, 53–64), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"), (id. at 82–83).  An administrative hearing was held before ALJ Keith Dietterle on April 7, 2016.  (Id. at 635–61.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a vocational expert ("VE").  (Id.)  The ALJ issued an unfavorable decision on May 2, 2016.[4]  (Id. at 20–37.)

The ALJ conducted the five-step sequential evaluation process in reaching his unfavorable decision.  (Id. at 25–33.)  At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity from December 11, 2011, the alleged onset date, through December 31, 2017, the date last insured.  (Id. at 25.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: sprains/strains and chronic pain syndrome.  (Id. at 25–27.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 28.)  The ALJ then found that Plaintiff had the residual functional

---

[3]  "AR" refers to the Administrative Record filed on December 23, 2022.  (ECF No. 12.)  The Court's citations to the AR in this Order are to the page numbers listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF"). For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

[4]  The "Court Transcript Index" in the AR incorrectly lists the "ALJ Hearing Decision" date as April 27, 2016.  (AR at 1.)

capacity ("RFC") to perform the full range of light work as defined in 20 CFR § 404.1567(b).  (Id. at 28–32.)  At step four, the ALJ determined that Plaintiff was capable of performing her past relevant work as a mortgage officer.  (Id. at 32.)  The ALJ then determined that Plaintiff was not disabled from December 15, 2011, the alleged onset date, through May 2, 2016, the date of the ALJ's decision.  (Id. at 32–33.)  On June 23, 2017, the Appeals Council denied Plaintiff's request for review.  (Id. at 1–7.)

On September 7, 2017, Plaintiff filed a complaint seeking review of the final decision of the Commissioner in the United States District Court for the Southern District of California.  (Id. at 758–67.)  On May 17, 2018, United States Magistrate Judge Robert N. Block issued a Report and Recommendation recommending that Plaintiff's motion for summary judgment be granted, the Commissioner's cross-motion for summary judgment be denied, and that the case be remanded for further administrative proceedings.  (Id. at 771–81); see also Stone v. Berryhill, Case No.: 3:17-cv-1689-W (RNB), 2018 WL 2317549, at *1 (S.D. Cal. May 17, 2018).  Notably, the parties raised, and Judge Block addressed, the exact issues raised in this action: (1) whether the ALJ properly rejected the opinion of Dr. Vakas Sial, and (2) whether the ALJ properly rejected Plaintiff's pain and symptom testimony.  (AR at 773.)  Judge Block found that (1) the ALJ failed to follow the proper legal standards when he rejected the opinion of Dr. Sial, and (2) the ALJ improperly rejected Plaintiff's pain and symptom testimony.  (Id. at 774–79).  On July 6, 2018, United States District Judge Thomas J. Whelan adopted Judge Block's Report and Recommendation, and remanded the case for further administrative proceedings.  (Id. at 768–70); see also Stone v. Berryhill, Case No.: 17cv1689-W-RNB, 2018 WL 3327873, at *1–2 (S.D. Cal. July 6, 2018).

## B.   **Proceedings After First Remand**

ALJ Randolph E. Schum presided over the case on remand, and on July 3, 2019, conducted an administrative hearing.  (Id. at 707–33.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a VE.  (Id.)  On September 13, 2019, ALJ Schum issued an unfavorable decision.  (Id. at 812–30.)

At step one of the five-step sequential evaluation process, the ALJ determined that Plaintiff did not engage in substantial gainful activity from December 11, 2011, the alleged onset date, through December 31, 2017, the date last insured.  (Id. at 818.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: "residual of lumbar surgery"[5] and chronic pain syndrome.  (Id.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 820.)  The ALJ then determined that Plaintiff had the RFC to perform sedentary work, as defined in 20 CFR 404.1567(a), except that Plaintiff was limited to:

> [l]ifting and carrying ten pounds occasionally and less than ten pounds frequently; standing and walking for up to two hours total in an eight-hour workday; sitting for at least six hours total in an eight-hour workday; occasional climbing of ramps, stairs, ropes, ladders, and scaffolds; occasional stooping, kneeling, crouching, and crawling; and [that Plaintiff] should avoid concentrated exposure to extreme cold, unprotected heights, vibration, and moving and dangerous machinery.

(Id.)  At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a loan officer/broker.  (Id. at 823–24.)  The ALJ then determined that Plaintiff was not disabled from December 15, 2011, the alleged onset date, through December 31, 2017, the date last insured.  (Id. at 824.)

---

[5]  Plaintiff underwent a lumbar decompression and Tarlov cyst excision on December 12, 2006, and suffered from numerous ailments after this procedure.  (Id. at 2326–27.)  Tarlov cysts are "fluid-filled sacs that are usually found at the bottom of the spine (the sacrum).  The cysts appear in the roots of the nerves that grow out of the spinal cord."  See  https://www.ninds.nih.gov/health-information/disorders/tarlovcysts#:~:text=Tarlov%20cysts%20%28also%20known%20as%20meningeal%20cysts%20or,spinal%20fluid%20in%20the%20cysts%20to%20build%20up. (last visited February 6, 2024).

On October 15, 2019, Plaintiff filed exceptions from the ALJ's unfavorable decision to the Appeals Council.  (Id. at 893–97.)  On September 28, 2020, the Appeals Council granted Plaintiff's exceptions and remanded the case back to the ALJ, finding that the ALJ's decision did "not comply with the district court or Appeals Council remand orders regarding adequate evaluation of opinion evidence provided by consultative examiner, Vakas Sial, M.D., as well as the evaluation of the claimant's subjective complaints."  (Id. at 831, 833; see also id. at 834–37.)  The Appeals Council instructed the ALJ to: (1) further evaluate Plaintiff's alleged symptoms and provide rationale in accordance with 20 CFR § 404.1529; (2) give further consideration to the treating and non-treating source opinions pursuant to 20 CFR § 1527, and explain the weight given to such opinion evidence; (3) reevaluate the statements by Plaintiff's daughter and provide specific reasons for the weight accorded; (4) give further consideration to Plaintiff's maximum RFC and provide appropriate rationale with specific references to evidence in the record in support of the assessed limitations; (5) give further consideration to whether Plaintiff has past relevant work and, if so, whether Plaintiff can perform it; and (6) if warranted, obtain supplemental evidence from a VE to determine whether Plaintiff has acquired any skills transferrable to other occupations.  (Id. at 834–35.)

## C.   **Proceedings After Second Remand**

ALJ Schum again presided over the remanded matter and conducted an administrative hearing on February 7, 2022.  (Id. at 735–51.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a VE.  (Id.)  On February 22, 2022, ALJ Schum issued an unfavorable decision.  (Id. at 668–89.)  The ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 11, 2011, the alleged onset date, through December 31, 2017, the date last insured.  (Id. at 682.)  The ALJ's decision became the final decision of the Commissioner on August 4, 2022, when the Appeals Council denied Plaintiff's request for review.  (Id. at 662–67.)  This timely civil action followed.  (See ECF No. 1.)

## II.  SUMMARY OF THE ALJ'S FINDINGS

ALJ Schum conducted the five-step sequential evaluation process in reaching his unfavorable decision.  (AR at 674–82.)  At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity from her alleged onset date of December 11, 2011, through the date last insured of December 31, 2017.  (Id. at 674.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: "residuals of lumbar surgery[6] with chronic pain syndrome of the sacral area with a history of cysts."  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 677.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work, as defined in 20 CFR 404.1567(a), except Plaintiff was limited to:

> [l]ifting and/or carrying ten pounds occasionally and less than ten pounds frequently; stand and/or walk for up to two hours in an eight-hour day; sit for at least six hours in an eight-hour day; never climb ropes ladders or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and [that Plaintiff] should avoid concentrated exposure to extreme cold, vibration, unprotected heights, and moving and dangerous machinery.

(Id.)  At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a loan officer/broker.  (Id. at 681–82.)  The ALJ then determined that Plaintiff was not disabled from December 15, 2011, the alleged onset date, through December 31, 2017, the date last insured.  (Id. at 682.)

/ / /

/ / /

/ / /

---

[6] See supra n.5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.  DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff is raising the following issues:

1.  Whether the ALJ properly considered Plaintiff's testimony.  (J. Mot. at 6.)

2.  Whether the ALJ provided specific and legitimate reasons to reject the opinion of the consultative examiner, Dr. Sial.  (Id.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [the court's] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The Court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely."  Revels, 874 F.3d at 654 (internal quotation omitted).

/ / /

/ / /

/ / /

/ / /

## V.  RELEVANT MEDICAL RECORDS[7] AND TESTIMONY

**A.**    **Treating Physicians**

### 1. Dr. Bakst

On October 17, 2012, Dr. Bakst, a neurologist, examined Plaintiff.  (Id. at 279–80.) Dr. Bakst reported the following:

> [Plaintiff] has had problems with her feet for years, with the initial symptoms [that included] soreness, and the sense that she was walking on glass.  Some years ago, or just prior to 2006, a Tarlov cyst was identified in her lumbar spine and she had surgery.  Subsequent to that, pain in the left lower extremity increased apparently due to scarring.  It got so bad that she could not sit or sleep[,] and this went on for years.  She finally went to physical therapy and found one particular therapist who treated her for about a year with significant resolution of these symptoms.  This particular treatment ended six months ago.

(Id. at 279.)

Dr. Bakst noted that Plaintiff had been diagnosed with peripheral neuropathy and questioned the severity of Plaintiff's previous diagnosis of small fiber neuropathy, which was established through a 2010 electromyography and nerve conduction study.  (Id.)  On April 8, 2013, Dr. Bakst referred Plaintiff to cognitive behavioral therapy to manage her pain.  (Id. at 281.)

### 2. Dr. Samarasinghe

On February 15, 2013,[8] Plaintiff was evaluated by Dr. Samarasinghe, an Internal Medicine specialist.  (Id. at 292.)  Dr. Samarasinghe documented Plaintiff's reports of left buttock pain and difficulty sitting.  (Id.; see also id. at 214, 304.)

---

[7]  Relevant medical records summarized below focus on Plaintiff's limitations on her ability to sit, which is at issue in this case.

[8]  The Court notes that Plaintiff's medical records contain notes from twelve previous appointments Plaintiff had with Dr. Samarasinghe to address chronic pain: November 17, 2010; December 8, 2010; January 12, 2011; March 14, 2011; June 3, 2011; September 11, 2011; December 1, 2011; March 9, 2012; August 3, 2012; October 17, 2012; and December 14, 2012.  (Id. at 215–16, 218, 220–30.)

### 3.  Dr. Jiu

On May 21, 2014, Dr. Jiu examined Plaintiff to "establish new patient" and for "PCP Bonding."  (Id. at 470–71.)  Dr. Jiu noted: "Musculoskeletal: Normal Range of Motion," and "Neurological: She is alert and oriented to person, place, and time.  No cranial nerve deficit. Gait normal."  (Id. at 471.)  Dr. Jiu did not specify any limitations on Plaintiff's ability to sit during the appointment and focused on Plaintiff's "allergic rhinitis."  (Id. at 471–72.)  She also requested an Allergy Department consultation to address Plaintiff's alleged sinus issues.  (Id. at 474).

### 4.  Dr. Macy

On May 28, 2014, Dr. Macy, an allergist, examined Plaintiff at Dr. Jiu's request to address Plaintiff's rhinitis and "throat clearing."  (Id.)  Dr. Macy's physical examination focused on Plaintiff's alleged sinus and throat issues, and noted "Neurological: [Plaintiff] is alert and oriented to person, place, and time."  (See id. at 474–76.)

### 5.  Dr. Rosen

On February 8, 2016, Plaintiff had a cortisone injection; and on May 11, 2016, Plaintiff reported that "the cortisone injection and Methadone worked great together," and that she obtained some level of relief that lasted for two months.  (Id. at 1154.)  Plaintiff also stated that she could not "stretch because her sitting bone area gets aggravated" and requested cortisone injections every four months, rather than every six months.  (Id.)  Plaintiff reported having the same symptoms as before she had received the injection, including pain in left leg hamstring, and pain when sitting, and described her pain level as "8–10/10."  (Id.)  On May 13, 2016, Dr. Rosen, a Physical Medicine and Rehabilitation physician, agreed to increase the frequency of injections from every six months to every five months, noting that "the injections may lose effectiveness if done too often."  (Id. at 1153.)

On September 19, 2016, Plaintiff had another appointment with Dr. Rosen.  (Id. at 1316–23.)  Dr. Rosen noted that Plaintiff's "[l]eft sciatica [was] treated by excision of Tarlov cyst," and it "[o]nly helped for about 6 weeks" before Plaintiff's chronic pain returned.  (Id. at 1317.)  Plaintiff reported staying in bed and not being able "to do anything."  (Id.)  Dr. Rosen also noted that Plaintiff's physical therapy in 2010 was "helpful," and that she "[d]oesn't tolerate sitting for > 1 hr."  (Id.)

On August 29, 2016, Dr. Rosen drafted a letter, stating that Plaintiff had been under his care for over two years to treat chronic lumbar pain syndrome.  (Id. at 1083.)  He further wrote the following:

> [Plaintiff] has been suffering from chronic bilateral lower extremity pains for years, characterized as "neuropathy."  This progressed to include disabling left sciatica which resulted in surgical treatment being recommended.  Her sacral decompression surgery in 2006 did not provide sustained relief and may have added to her chronic daily pain, including pain radiating to the perineal area.  She has additionally been diagnosed with lumbar spinal stenosis, which manifests as additional leg pains, and markedly limits her ability to be active.

(Id.)

Dr. Rosen further stated that "[s]ince her 2006 surgery, [Plaintiff] has not been able to work in th[e] demanding loan business environment full time.  She is unable to tolerate prolonged desk work and driving."  (Id.)  Dr. Rosen also determined that Plaintiff's "persistent chronic pain and the toll this has taken emotionally and physically, combined with medication negative effects . . . preclude [Plaintiff] from being able to return to competitive work force."  (Id.)

On August 14, 2018, Dr. Rosen filled out a "Physical Medical Source Statement" form.  (Id. at 1085–87.)  He stated that he had been treating Plaintiff for four years and had been seeing Plaintiff twice per year.  (Id. at 1085.)  He listed the following diagnoses: chronic pain from lumbar spinal stenosis; failed laminectomy, with chronic sciatica; back pain; and hamstring injury.  (Id.)  Dr. Rosen wrote that Plaintiff suffers from "chronic

lower spine & sacral pain, including left gluteal + leg pain," and that Plaintiff can walk half a block "without rest or severe pain." (Id.)

Dr. Rosen further stated that Plaintiff can sit for ten minutes at one time before needing to get up, and less than two hours in an eight-hour workday. (Id.) He also opined that Plaintiff can stand/walk for two hours in an eight-hour day. (Id.) Additionally, Dr. Rosen determined that Plaintiff can lift and/or carry ten pounds occasionally and less than ten pounds frequently; occasionally move her head in all directions; rarely stoop, bend, and climb stairs; never twist, crouch, squat, and climb ladders; perform gross and fine manipulations for fifty percent of the workday on the right and ten percent on the left; and reach in all directions for five percent of the workday. (Id. at 1086–87.) He also opined that Plaintiff would need to take unscheduled breaks every two-to-four hours during an eight-hour workday, rest for twenty-to-thirty minutes before returning to work, and that Plaintiff would likely be "absent from work as a result of [her] impairment or treatment" more than four days per month. (Id.) Finally, Dr. Rosen wrote that Plaintiff's "[p]ain & medication limit her ability to focus[,] which may result in work mistakes and safety issues." (Id. at 1087.)

**B.    Examining Physicians**

**1.  Dr. Sial**

On February 5, 2014, Plaintiff had a consultative examination with Dr. Sial, an Internal Medicine specialist. (Id. at 303–09.) Dr. Sial reviewed Plaintiff's medical records and noted that Plaintiff's treating physician, Dr. Samarasinghe, documented in his progress note "left buttock pain" and "difficulty sitting." (Id. at 304 (citing id. at 292).) Dr. Sial's physical examination of Plaintiff "include[d] not only the formal examination, but also observation of [Plaintiff's] movements in the examination room and ability to get on and off the examination table." (Id. at 305.) Dr. Sial found that Plaintiff "ambulate[d] with an abnormal gait due [to] sacral pain," and opined that Plaintiff's left buttock and sacral pain would "limit [Plaintiff's] activities." (Id. at 307–08.) Dr. Sial determined that Plaintiff's exertional limitations included the following:

1

2

> Standing and/or walking (with normal breaks) can be done for up to 2 hours in a normal 8-hour workday.

3

> . . . .

4

5

6

> Sitting (with normal breaks) can be done [for] two hours.  Outside of the normal break periods, [Plaintiff] must periodically alternate sitting and standing to relieve pain/discomfort.

7

(Id. at 308.)

8

### 2.  Dr. Tran

9

10

11

12

13

On October 20, 2021, Plaintiff had an orthopedic consultative examination with Dr. Tran, a physical medicine and rehabilitation specialist.[9]  (Id. at 2398–404.)  Dr. Tran assessed Plaintiff's functional limitations, and concluded that Plaintiff could stand and walk four hours in an eight-hour workday, and sit six hours in an eight-hour workday.  (Id. at 2404.)

14

### 3.  Dr. Glazener

15

16

On September 28, 2021, Plaintiff had a consultative examination with Dr. Glazener.  (Id. at 703–04.)  Dr. Glazer wrote the following:

17

18

19

20

21

22

23

> Approximately 20 years ago [Plaintiff] underwent lumbar surgery and has had some persistent pain.  She attributes it to sacral issues.  She has even had a sacral transforaminal injections in the past and they apparently have not provided much relief.  Her principal complaint is pain across the lower back and buttock area.  She is unable to sit down for any length of time because of this severe pain.  Seemed like initially it affected the area of the left posterior thigh and lower buttock area.  It is different now, it is more involved on both sides.  She does methadone and she uses ice intermittently.  She avoids sitting at all costs . . . .

24

25

26

27

28

---

[9]  The Court notes that this examination occurred nearly four years after December 31, 2017, the date last insured.  (Id.; see id. at 682.)

(Id. at 703.)  Dr. Glazener noted during his physical examination that Plaintiff "cannot sit down or would not sit down," and determined that Plaintiff was experiencing post-laminectomy syndrome.  (Id.)

**C.    Non-Examining Physician**

**Dr. Pong**

Dr. Pong, a state agency medical consultant, reviewed Plaintiff's medical records on the reconsideration level of review on March 4, 2014.  (Id. at 61–62.)  Dr. Pong found that Plaintiff had the RFC to stand and/or walk with normal breaks for six hours in an eight-hour workday, and sit with normal breaks for six hours in an eight-hour workday. (Id. at 61.)

**D.    Imaging**

Plaintiff had X-rays of her lumbosacral spine on July 23, 2014.  (Id. at 447.)  Dr. Elam reviewed the X-rays and found "moderate disk degeneration at L2–3."  (Id.)

Plaintiff also had MRIs of her lumbar spine on September 8, 2014, and September 24, 2014.  (Id. at 448–50.)  Dr. Balen reviewed the MRIs and found "[m]oderate degenerative change of the lumbar spine; moderate central canal narrowing at L4/5; and multilevel mild neuroforaminal narrowing.  There was grade 1 anterolisthesis of L2 upon L3; and "[c]ystic dilatation of the nerve root sleeve predominately on the right at S2."  (Id.)

On September 6, 2018, Plaintiff had an MRI of her lumbar spine.  (Id. at 2048–50.) Dr. Nordling reviewed the MRI and found postsurgical changes in the midline upper sacrum; mild scattered lumbar spondylosis most pronounced at L4–5, where there was "deformity upon the proximal most left sided exiting nerve root," and a "small dilated perineural root sleeve cyst" on the right, "disc material extend[ing] into the inferior aspect of the right neural foramen contour[ing] the undersurface of the exiting right L4 nerve root without deformity."  (Id. at 2049–50.)  Further, there were "[s]cattered dilated perineural root sleeve cysts" and "[s]cattered Tarlov cysts involving the S1–S2 level." (Id.)

Additionally, Plaintiff had an MRI of her sacrum and coccyx on September 7, 2018.  (Id. at 2051.)  Dr. Balen reviewed the MRI and found L4/5 posterior disc protrusion" and "[f]acet degenerative changes."  (Id.)  He further noted the following:

> At the level of S1/2 multiple cystic foci are present.  The largest single cystic lesion is present off to the right side.  Opportunity left-sided 1.3 cm cystic lesion is present.  Additional smaller collections are seen at the right and left side.  These are likely a combination of Tarlov cysts and dilated perineural root sleeve cysts.

(Id. at 2051–52.)  Dr. Balen listed the following impressions: (1) cystic foci at the S1/2 level most consistent with Tarlov cysts and dilated perineural root sleeve cysts, greater on the right, and (2) moderate tendinosis of the proximal right hamstring tendons with mild adjacent ischial tuberosity bursitis.  (Id. at 1052.)

**E.    Testimony during Plaintiff's February 7, 2022 administrative hearing**

    **1.  Plaintiff's testimony**

On February 7, 2022, during her third administrative hearing, Plaintiff testified that in 2007, two Tarlov cysts were discovered in her sacral area, and the cysts caused chronic pain in her feet and legs.  (Id. at 740.)  One cyst was removed "on the left side because it had gotten quite big and it was very painful."  (Id.)

Plaintiff testified that she had stopped working years before 2011, when she was removed from the payroll at the California Public Employees' Retirement System ("CalPERS").  (Id. at 739–41.)  She worked as a loan officer, and her daughter had to do the bulk of Plaintiff's work.  (Id. at 740.)

Plaintiff also testified that due to sacral pain, sitting for more than five minutes was very difficult.  (Id. at 741.)  When the ALJ asked Plaintiff whether physical therapy in 2011 increased her "tolerance of sitting up to seven hours a day," Plaintiff responded as follows: "I was never able to sit down.  It's been a—very difficult for me.  I've been out to dinner twice in the last 15 years and both times, I had to leave in the middle of dinner." (Id. at 741–42.)  Plaintiff further stated that she could walk "for maybe ten minutes," but "the abrasion of walking cause[d] a lot [of] inflammation and the only remedy [wa]s pain

medication and ice packs." (Id. at 742.)  Additionally, Plaintiff testified that she was not able to work because she was not able to sit down and to move her left leg.  (Id.)

Plaintiff also stated that she was receiving treatments and taking medications.  (Id.) She tried several medications to relieve her symptoms, including Oxycontin and Methadone, but "the pain medication ha[d] been a disappointment." (Id. at 742–43.) Plaintiff explained that "[t]he pain medication.  Well, it's just an awful, awful feeling.  It just clouds your brain.  You don't think right.  Your personality changes.  It's difficult to string a sentence together.  It's really sad." (Id. at 743.)

Further, when the ALJ asked Plaintiff what her doctors projected with respect to her response to any additional treatments, Plaintiff stated the following:

> It's not good.  No doctor has—you know, I get a lot of sad looks.  And they just say that they cant's help me or wouldn't even want to take the chance to—they're afraid.  Several doctors have said that they're afraid they'll make me worse, so they're not going to touch me.

(Id.)

Plaintiff also testified that she "gave up" her home, sold all furniture, and moved to a small apartment, and her caregiver did her grocery shopping and laundry.  (Id.) Plaintiff stated that two years before the administrative hearing, she had been able to go to the grocery store three blocks away, but it was a "big chore," and she used a cane to get around.  (Id. at 744.)  Further, up to two years before the administrative hearing, Plaintiff had been able to go to doctor's appointments, vacuum her apartment, and sometimes do laundry, but most of the time, Plaintiff's daughter helped her.  (Id. at 745–46.)  Additionally, Plaintiff stated that she was able to take a shower, but could not do it often because she was "wobbly." (Id.)  Plaintiff further testified that she had been able to walk her dog before, but could no longer do it at the time of the administrative hearing because it was "too strenuous." (Id.)

Plaintiff explained to the ALJ that she had stenosis in the lumbar area, to which the ALJ replied that he was "not interested in the medical terms"; and Plaintiff then testified

that her problems were not in the lumbar area, but rather in the sacral area.  (Id. at 741.)
She testified that she had been bedridden for years, including the time frame between
2011 and 2017, and laying down helped relieve her pain if she had ice packs and pain
medication.  (Id. at 744.)  Plaintiff further stated that she could no longer sit down in her
vehicle, because, as confirmed by her recent MRIs, "a lot more cysts ha[d] been growing
over the years."  (Id.)[10]

/ / /

/ / /

---

[10]   The Court notes that during her first administrative hearing on April 7, 2016, Plaintiff testified that she stopped working as a mortgage lender because she could no longer concentrate due to pain.  (AR at 640.)  She testified that she had a Tarlov cyst removed from S2 on her left side, and had "permanent nerve damage on [her] sciatic nerve."  (Id.)  Despite the surgery, Plaintiff was in pain "all day."  (Id.)  Without medications, Plaintiff's pain level ranged between 6/10 and 8/10.  (Id. at 640–41.)  She was prescribed Methadone, which provided some relief; however, due to medications, Plaintiff had difficulties with concentration and memory.  (Id. at 655.)  Plaintiff also testified that she had problems with her feet due to inflammation, pain, numbness, and swelling, and needed to elevate her legs for an hour to reduce the swelling.  (Id. at 642–43, 653–54.)  Additionally, Plaintiff stated that she lived in a small apartment, was able to do laundry, sweep and vacuum, but could not mop.  (Id. at 644.)  She could sit for ten-to-fifteen minutes.  (Id. at 654–55.)  Plaintiff also testified that she took her dog on ten-minute walks six times a day, and such walks helped her feet from getting numb.  (Id. at 646, 654.)  Further, Plaintiff stated that she shopped for groceries every other week, but was in bed for about sixteen-to-seventeen hours a day, had "wobbly" feet when she showered, and had difficulty "going up and down stairs."  (Id. at 644, 646–48, 650.)

During her second administrative hearing on July 3, 2019, Plaintiff testified that although she was initially able to work from home, and alternate between walking around the house and sitting at her desk, her pain caused her to make many mistakes, and she was eventually fired as a mortgage lender.  (Id. at 707, 711–12.)  She testified that she had a cysts removed from "S2 on the left side," and the "cyst was quite large" and caused "a lot of damage to the nerves in that area."  (Id. at 713.)  By 2019, Plaintiff could sit for fifteen minutes and walk for forty-five minutes a day.  (Id.)  She could walk her dogs and do one errand a day, but had to be in bed for two to three hours between those activities.  (Id.)  Although Plaintiff grocery shopped, there were times when she had to return home because of pain.  (Id. at 715–16.)  She was prescribed Methadone and received pain injections every five months, which initially provided relief for about three months, but subsequent injections provided relief for two months.  (Id. at 719–20.)  Because of chronic pain, Plaintiff had to lay down eighteen-to-twenty hours per day.  (Id. at 720.)  On a bad day, she walked the dogs, did dishes or other chores, and had to go back to bed.  (Id. at 721.)

### 2. Examination of the VE

During Plaintiff's administrative hearing, ALJ Schum posed the following hypothetical to the VE:

> It's opined that this hypothetical claimant can lift and carry ten pounds occasionally, less than ten pounds frequently. <u>Can stand or walk for up to two hours out of eight, sit for at least six.</u> Should never climb ropes, ladders, or scaffolds. Can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid[] concentrated exposure to extreme cold, vibration, unprotected heights and moving and dangerous machinery.

(<u>Id.</u> at 747–48 (emphasis added).) Under these limitations, the VE opined that such individual could return to past relevant work, but "not as [Plaintiff] always performed it, according to her testimony." (<u>Id.</u> at 748.)

Plaintiff's counsel then posed the same hypothetical question, but restricted the individual's ability to sit to four hours in an eight-hour workday. (<u>Id.</u> at 748–49.) The VE opined that such an individual would not be able to perform Plaintiff's past relevant work, and that such individual's RFC would be considered less than sedentary. (<u>Id.</u> at 749.)

## VI. DISCUSSION

### A. <u>The ALJ Improperly Discounted Plaintiff's Testimony</u>

#### 1. Parties' arguments

Plaintiff contends that the ALJ erred by failing to provide specific, clear, and convincing reasons for rejecting Plaintiff's testimony regarding her pain and limitations. (J. Mot. at 9, 25.) Plaintiff alleges that the ALJ failed to consider Plaintiff's July 2014 X-rays and September 2014 MRIs of lumbar spine. (<u>Id.</u> at 10.) Plaintiff further states that the ALJ isolated a small period of time during which Plaintiff experienced some relief from physical therapy, but ignored numerous records showing that Plaintiff's improvement was temporary, and her symptoms of pain and numbness in the lower extremities increased overtime. (<u>Id.</u> at 11–12.) Plaintiff also alleges that her daily activities do not contradict her testimony and do not demonstrate that she is able to spend

a substantial part of the day doing activities transferrable to a work setting, because the majority of activities that the ALJ cited "were done in 10-minute time frames for a total of one hour in a 24-hour day; or done very minimally; or required much more rest after doing them."  (Id. at 14–17.)

Defendant argues that the ALJ summarized Plaintiff's allegations and "incorporated by reference the summary of medical and nonmedical evidence contained in the previous two decisions."  (Id. at 20.)  Defendant also contends that the ALJ gave Plaintiff's statements less weight because they were inconsistent with the medical record.  (Id. at 20–21.)  Defendant further asserts that the ALJ properly found that Plaintiff's pain had been well managed with medication and other treatments, and her daily actives showed that she "retained functional abilities."  (Id. at 21–23.)  Finally, Defendant maintains that even if the ALJ erred, the error was harmless because the ALJ provided other "bases for discounting Plaintiff's allegations."  (Id. at 23.)

### 2.  Applicable law

The Ninth Circuit has established a two-part test for evaluating a claimant's allegations regarding subjective symptoms.  See Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017); see also Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016).[11]  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged."  Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  Second, if a claimant presented such evidence, and there is no evidence of malingering, the ALJ may reject the claimant's statements

---

[11] "[A]ssessments of an individual's testimony by an ALJ are designated to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness."  Trevizo, 871 F.3d at 678 n.5 (quoting SSR 16-3p, 2016 WL 1119029).

about the severity of the claimant's symptoms "only by offering specific, clear and convincing reasons for doing so." Id.

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  "[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." Id. at 489.  Instead, the ALJ must identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014)); see also Burrell v. Colvin, 775 F.3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the claimant's testimony, and did not make "a specific finding linking a lack of medical records to [the claimant's] testimony about the intensity" of her symptoms); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals.  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2016 WL 1119029.  In addition, the ALJ may consider other factors, such as the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain.  See 20 C.F.R. §§ 404.1529(c)(3), 419.929(c)(3); SSR 16-3p, 2016 WL 1119029.

### 3.  Analysis

The parties do not dispute the ALJ's finding that Plaintiff has the following severe impairments: "residual of lumbar surgery with chronic pain syndrome of the sacral area with a history of cysts."  (AR at 674; <u>see also</u> J. Mot.)  The parties also do not contest the ALJ's determination that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms."  (AR at 678; <u>see also</u> J. Mot.)  Accordingly, the first prong of the ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.

Additionally, neither party alleges that the ALJ found that Plaintiff was malingering.  (<u>See</u> J. Mot.)  The Court therefore is required to determine whether the ALJ identified which of Plaintiff's subjective allegations of impairment he discounted, and whether the ALJ provided specific, clear, and convincing reasons for doing so.  <u>See</u> <u>Brown-Hunter</u>, 806 F.3d at 489; <u>Lambert</u>, 980 F.3d at 1277.

In his written opinion, the ALJ noted that Plaintiff alleged disability due to "multiple physical and mental impairments," (AR at 678), and that Plaintiff:

> allege[d] that she had not worked since 2007, due to residuals of cyst removal surgery and leg and feet pain . . . .  She denied problems in the lumbar area; however, she alleged severe buttock and leg pain and that she could not sit (Exh. 5E, at pg. 1).  The claimant alleged that she laid in bed most of the day.  She used a cane for ambulation.  Her daughter helped her with many tasks.  As for her activities of daily living, the claimant was able to vacuum, do her own laundry, and shower herself.

(<u>Id.</u>)

The ALJ then discounted Plaintiff's statements regarding her impairments for the following reasons: (1) Plaintiff's pain was well managed with medication and other treatments; (2) Plaintiff's daily activities were inconsistent with her allegations regarding the intensity, persistence, and limiting effects of her symptoms; and (3) Plaintiff's

22cv1499-LR

subjective pain testimony was not supported by the objective medical evidence in the record.[12]  (Id. at 678–81.)

The Court can only assess the reasoning the ALJ provided in his decision.  See Revels, 874 F.3d at 654 (stating that a court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely"); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.").  The Court will therefore examine the ALJ's stated reasons for discontinuing Plaintiff's testimony.

/ / /

/ / /

_____

[12]  Although not entirely clear from the ALJ's written opinion, the ALJ may have also found that Plaintiff's treatment was conservative in nature.  (See AR at 678–79.)  The ALJ is required to identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony, which the ALJ did not do here.  See Lambert, 980 F.3d at 1277.  Nevertheless, to the extent the ALJ discounted Plaintiff's subjective symptom testimony because he concluded that Plaintiff's treatment was conservative, this is not a clear and convincing reason to discount Plaintiff's subjective symptom testimony.  As discussed in detail in this Order, Plaintiff was treated with numerous epidural steroid injections and narcotic pain medications.  "Many courts have previously found that strong narcotic pain medications and spinal epidural injections are not considered to be 'conservative' treatment."  Beatriz B. v. Saul, Case No.: 3:19-cv-00785-AHG, 2020 WL 4035450, at *6 (S.D. Cal. July 16, 2020)) (citing Juan C. P. v. Saul, No. ED CV 19-427-PLA, 2019 WL 6039944, at *8 (C.D. Cal. Nov. 14, 2019)); see also Christie v. Astrue, No. CV 13–08307–VBK, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize treatment with narcotics, steroid injections, trigger point injections, and epidural injections as "conservative"); Yang v. Barnhart, No. ED CV 04-958-PJW, 2006 WL 3694857, at *4 (C.D. Cal. Dec. 12, 2006) (finding that the ALJ's determination that claimant received "conservative" treatment was not supported by substantial evidence, where the claimant underwent physical therapy, received epidural injections, and was treated with several pain medications).  Notably, after her initial surgery, Plaintiff did not undergo further surgeries to remove Tarlov cysts because her physicians did not project that surgical intervention would be successful, and even opined that it may worsen Plaintiff's condition.  (See AR at 743.)  As such, Plaintiff's treatments were not "conservative," and this reason is not a clear and convincing reason supported by substantial evidence in the record to discount Plaintiff's subjective symptom testimony.

21

### a. Management with medication and treatments

The ALJ discounted Plaintiff's symptom testimony after concluding that Plaintiff's "pain has been generally well managed with medication and other treatments." (AR at 678–79.) The ALJ stated that Plaintiff "reported doing well and having very little back pain during several visits in 2012," (id. (citing id. at 216, 220)), and cited Dr. Samarasinghe's appointment notes dated March 9, and October 17, 2012, (id. at 214–16; see also id. at 218, 220–30). The ALJ also cited May 11, 2016, progress note stating that Plaintiff's low back pain resolved after her February 2016 cortisone injection, the relief lasted for two months, the cortisone injection and methadone "worked great together," and that Plaintiff walked daily. (Id. at 679 (citing id. at 1154).) Additionally, the ALJ cited Dr. Rosen's July 26, 2016 appointment note that Plaintiff reported obtaining three-to-four months of relief after an epidural steroid injection, "noted the aching in her legs was significantly diminished" after the second lumbar epidural steroid injection, and that Plaintiff "reported being able to walk more with improved endurance through the day, no longer needing to nap or put up her feet, and with significantly reduced bilateral lower extremity pain." (Id. at 679 (citing id. at 1233).)

In assessing a claimant's subjective symptoms, an ALJ may consider the "type, dosage, effectiveness, and side effects of any medication taken to alleviate pain," and "treatment, other than medication" the claimant receives to relieve "pain or other symptoms." See 20 C.F.R. §§ 404.1529(c)(3)(iv)–(v), 416.929(c)(3)(iv)–(v). An ALJ cannot "reject a claimant's testimony merely because symptoms wax and wane in the course of treatment" because "[c]ycles of improvement and debilitating symptoms are a common occurrence." Garrison, 759 F.3d at 1017; see also Morales v. Berryhill, 239 F. Supp. 3d 1211, 1216 (E.D. Cal. 2017) (noting that some improvement "with treatment is to be expected"). Further, "[a]n ALJ cannot simply pick out a few isolated instances of improvement over a period of months or years but must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms." Attmore, 827 F.3d at 877 (internal quotation marks omitted) (quoting

1 Garrison, 759 F.3d at 1017); see also Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir.

2 2014) ("observations [of improvement] must be 'read in context of the overall diagnostic

3 picture' the provider draws").

4       The ALJ's citation of appointment notes from two out of thirteen appointments

5 Plaintiff had with Dr. Samarasinghe to demonstrate a trend of improvement in Plaintiff's

6 symptoms mischaracterized the nature of Plaintiff's symptoms.  For example, on

7 February 15, 2013, merely four months after the October 17, 2012 progress note that the

8 ALJ cited to demonstrate Plaintiff's purported improvement, Dr. Samarasinghe wrote in

9 his progress notes that Plaintiff once again reported left buttock pain and difficulty

10 sitting.  (AR at 214, 304.)  Likewise, with respect to Dr. Rosen's findings the ALJ cited,

11 pain relief for two months after a cortisone injection does not indicate a "well managed"

12 symptom, because, according to Dr. Rosen's notes, a cortisone injection may only be

13 administered every five or six months before losing its effectiveness.  (See id. at 1153

14 (containing Dr. Rosen's May 13, 2016 note that after Plaintiff's request, he agreed to

15 increase the frequency of injections from every six months to every five months, and that

16 he cautioned Plaintiff that "the injections may lose effectiveness if done too often.").)

17 Notably, three months after the injection, Plaintiff reported to Dr. Rosen a pain level of

18 8–10/10, and the same symptoms she had before the injection, including left leg

19 hamstring pain and pain when sitting.  (Id. at 1154.)

20       Although the ALJ cited several medical records showing some improvement with

21 treatment and medications, most of those records were made after Plaintiff received

22 epidural steroid injections, and the ALJ ignored numerous records demonstrating that

23 those improvements were temporary.  Further, the ALJ did not discuss or even

24 acknowledge X-ray and MRI findings in Plaintiff's medical records, which showed

25 degeneration and abnormalities in her sacral area.  (See id. at 447–50; 1048–51.)

26       The record in this case shows that after Plaintiff had a surgery to remove Tarlov

27 cyst in her lumbar spine on December 12, 2006, she reported significant amounts of pain

28 (apparently due to scarring), burning, and numbness, which increased overtime,

especially when sitting, and was diagnosed with chronic pain syndrome in March 2012.
(See, e.g., id. at 220, 279, 323.)  Despite receiving numerous epidural steroid injections,
undergoing physical therapy, and taking narcotic pain medications, such as OxyContin,
and Tramadol, Plaintiff reported significant levels of pain ranging between 7–8 out of 10
to the same physicians, both before and after the appointments that the ALJ cited in his
opinion.  (See, e.g., id. at 742–43, 1254, 1436–37, 1499, 1633, 1788.)  Further, despite
the medications and treatments, Plaintiff reported spending most of her time in bed
because of pain, and continued to request additional treatments, indicating an on-going
problem with managing her pain symptoms.  (See id. at 1633, 1788); see also Beatriz B.
v. Saul, Case No.: 3:19-cv-00785-AHG, 2020 WL 4035450, at *6 (S.D. Cal. July 16,
2020) (concluding that plaintiff's medications and trigger point injections were the types
of treatments that "indicate[d] a significant pain issue").  Notably, Plaintiff testified
during her last administrative hearing that her doctors were skeptical about the
effectiveness of additional invasive and non-invasive treatments, and "[s]everal doctors
have said that they're afraid they'll make me worse, so they're not going to touch me."
(See id. at 743.)

The ALJ's selective citations did not address the overall dynamic of Plaintiff's
symptoms, and disregarded numerous medical records documenting that Plaintiff's
improvement with medication and treatment was temporary.  Accordingly, the ALJ's
finding of improvement with treatment was not supported by substantial evidence in the
record.  See Costa v. Berryhill, 700 F. App'x 651, 653 (9th Cir. 2017) (concluding that
although several records contained plaintiff's reports that her migraines subsided after
taking medication, the record as a whole showed that plaintiff's migraines were not well
controlled because she consistently sought treatment for her severe migraines); see also
Parker v. Saul, Case No.: 20cv2530-BLM, 2022 WL 4798162, at *7–8 (S.D. Cal.
Sept. 30, 2022) (concluding that substantial evidence did not support the ALJ's decision
to discount plaintiff's subjective symptom testimony due to improvement with
medication and treatment, where plaintiff's symptoms temporarily improved with pain

medication, but the symptoms subsequently returned); <u>Dennis R. v. Comm'r of Soc. Sec.</u>, Case No. C20-5836 RAJ, 2021 WL 2328374, at *2 (W.D. Wash. June 8, 2021) (holding that "[i]mprovement with treatment was not a clear and convincing reason to discount [p]laintiff's testimony," where "records note[d] some improvement, but none indicate[d] [p]laintiff's symptoms were fully relieved or otherwise contradict[ed] [p]laintiff's testimony"); <u>Gomez v. Berryhill</u>, Case No.: 17-cv-01582-MMA (RNB), 2018 WL 3019935, at *11 (S.D. Cal. June 18, 2018) (finding that the ALJ erred by discounting plaintiff's subjective symptom testimony where, among other things, plaintiff reported "much success" with cortisone injections, but also stated that the injections were "helpful for short term" and not "for long term," and plaintiff's pain level returned to 7–8 out of 10).  The Court therefore finds that improvement with medication and treatments is not a clear and convincing reason to discount Plaintiff's subjective symptom testimony.

### b.  Activities of daily living

The ALJ also discounted Plaintiff's testimony after concluding that Plaintiff's activities of daily living were not consistent with her subjective symptom allegations. (<u>See</u> AR at 679.)  In support, the ALJ cited Plaintiff's reports of doing house chores and walking the dog five times per day.  (<u>Id.</u>)  The ALJ also noted Plaintiff's ability to vacuum, do laundry, and shower.  (<u>Id.</u> at 678.)

An ALJ may properly consider the claimant's daily activities in evaluating testimony regarding subjective symptoms.  <u>See</u> 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  There are "two grounds for using daily activities to form the basis of an adverse credibility determination": an ALJ may find that daily activities either (1) contradict the claimant's other testimony, or (2) meet the threshold for transferable work skills.  <u>Orn v. Astrue</u>, 495 F.3d 625, 639 (9th Cir. 2007); <u>see also</u> <u>Steele v. Berryhill</u>, Case No.: 3:17-cv-01923-LAB (RNB), 2018 WL 2718033, at *3 (S.D. Cal. June 6, 2018) (same).

As an initial matter, although the ALJ cited certain daily activities that Plaintiff could perform, such as doing house chores and walking a dog five times per day, the ALJ

did not discuss other evidence showing the difficulties Plaintiff experienced on a daily basis.  This evidence included testimony that Plaintiff was not able to sit for a prolonged period of time due to sacral pain; that she was limited to short walks because of pain and because she needed to take breaks to rest, take pain medication, and apply ice packs; and that Plaintiff's caregiver frequently helped her with house chores.  (See AR at 741–46.)  "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  Smolen v. Chater, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996); see also Diedrich v. Berryhill, 874 F.3d 634, 642–43 (9th Cir. 2017) ("House chores, cooking simple meals, self-grooming, paying bills, writing checks, and caring for a cat in one's own home, as well as occasional shopping outside the home, are not similar to typical work responsibilities"; concluding that the claimant's ability to perform such activities was not a clear and convincing reason to find the claimant less than fully credible); Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (citation omitted) ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled.").  Plaintiff's ability to do certain household chores and walk her dog are the type of activities the Ninth Circuit has consistently identified as the types of activities insufficient to discount subjective symptom testimony, and Plaintiff's ability to participate in some daily activities does not contradict the evidence of serious problems that she encountered in her daily life during the relevant timeframe.  See id.; see also Allen R. v. Saul, Case No. 6:20-cv-00790-SB, 2021 WL 4468922, at *4 (D.Or. Sept. 29, 2021) (citing Meuser v. Colvin, 838 F.3d 905, 913 (7th Cir. 2016)) (explaining that an ALJ cannot "disregard a claimant's limitations in performing" his activities, where the ALJ discounted the claimant's testimony based on, among other things, the claimant's ability to complete

chores, but the "ALJ ignored evidence" that the claimant received help from family members and rarely left the house).

To the extent the ALJ determined that Plaintiff's daily activities contradicted her other testimony, the ALJ has not identified any material discrepancies in Plaintiff's statements regarding her symptoms and limitations. See Orn, 495 F.3d at 639. Notably, the Court's review of Plaintiff's testimony during her three administrative hearings in this case indicates that Plaintiff's testimony has been consistent throughout the hearings and has demonstrated a steady decline in her abilities to engage in daily activities. (See AR at 741–46; see also id. at 640, 642–48, 650, 653–55 (containing Plaintiff's testimony during her first administrative hearing on April 7, 2016, that she lived in a small apartment, was able to do laundry, sweep and vacuum, but could not mop because she got too tired; she could sit for ten-to-fifteen minutes and walk her dog for six-to-ten minutes up to six times a day, noting that such walks helped her feet from getting numb; that she had difficulties with showering because her feet were "wobbly"; she grocery shopped every other week; she was only able to drive when she didn't take her pain medication; and because of chronic pain, she was in bed for about sixteen-to-seventeen hours per day); id. at 713, 720–21 (containing Plaintiff's testimony during her second administrative hearing on July 3, 2019, that she could sit for fifteen minutes, walk her dogs, and do one errand a day; that because of her pain, she had to be in bed for two-to-three hours between those activities; and that she had to lay down eighteen-to-twenty hours per day).

Further, Plaintiff's daily activities were sporadic and required frequent rest breaks, and she did not engage in those activities during a substantial portion of her day. Because Plaintiff was not performing her daily activities with the consistency and persistence required by a typical work environment, such activities do not meet the threshold for transferrable work skills. See Orn, 495 F.3d at 639; see also Ghanim, 763 F.3d at 1165 (internal quotation marks omitted) (concluding that the ALJ improperly discounted claimant's symptom testimony because of the claimant's ability to engage in certain daily activities, where "there [wa]s no indication . . . that the limited activities [the

1    claimant] engaged in, often with the help of a friend, either comprised a 'substantial'

2    portion of [the claimant's] day, or were 'transferrable' to a work environment."); Reddick

3    v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (concluding that ALJ's finding that

4    claimant's daily activities indicated the claimant's ability to work was unsupported by the

5    record, where the claimant's daily activities were "sporadic and punctuated with rest");

6    Beatriz B., 2020 WL 4035450, at *7 (finding that plaintiff's daily activities, which

7    included driving a car, shopping for groceries, preparing complete meals, walking dogs,

8    cleaning, and laundry, were not "comparable with working for sustained period of time,"

9    where the plaintiff testified that she had to take frequent breaks when performing such

10   tasks, and that she could not tolerate prolonged standing or sitting without taking a

11   break).  The ALJ therefore erred in discounting Plaintiff's subjective symptom testimony

12   based on Plaintiff's daily activities.

             **c.  Inconsistencies with medical evidence**

13

14          The ALJ also discounted Plaintiff's subjective symptom testimony, reasoning that

15   Plaintiff's statements regarding her pain were inconsistent with objective medical

16   evidence.  (AR at 679–81.)  Even if this reason was supported by substantial evidence,

17   the ALJ's other reasons for discounting Plaintiff's subjective symptom testimony were

18   not supported by substantial evidence; and this reason alone is not sufficient to discredit

19   Plaintiff's subjective testimony.  See 20 C.F.R. § 416.929(c)(2) (providing that an ALJ

20   cannot reject subjective statements about pain solely because the medical evidence does

21   not corroborate the statements); Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005)

22   ("[A]n ALJ may not reject a claimant's subjective complaints based solely on a lack of

23   medical evidence to fully corroborate the alleged severity of pain."); Light v. Social Sec.

24   Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks

25   credibility cannot be premised wholly on a lack of medical support for the severity of his

26   pain."); see also Matthew D. v. Kijakazi, Case No. 6:20-cv-1716-SI, 2022 WL 2802134,

27   at *7 (D. Or. July 18, 2022) (finding that the ALJ erred in rejecting plaintiff's subjective

28   symptom testimony, where the ALJ's only remaining reason for rejecting plaintiff's

testimony was that it was not fully corroborated by objective medical evidence in the record); Daniel B. v. Comm'r, Soc. Sec. Amin., No. 3:19-cv-00033-HZ, 2020 WL 3605846, at *6 (D. Or. July 2, 2020) (finding that the ALJ's stated reason to discount plaintiff's subjective symptom allegations on the ground that plaintiff's medical record "d[id] not contain objective findings that would support the extent of [plaintiff's subjective symptom] allegations" was insufficient, where other reasons cited by the ALJ did not support the decision to discount plaintiff's subjective symptom testimony).

### d.  Conclusion

Accordingly, although the ALJ provided three reasons for discounting Plaintiff's subjective symptom testimony, two of those reasons were not supported by substantial evidence.[13]  The Court therefore finds that the ALJ did not provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting Plaintiff's subjective symptom testimony.

## B.  **The ALJ Improperly Evaluated Dr. Sial's Opinion**

### 1.  Parties' arguments

Plaintiff asserts that the ALJ did not provide specific and legitimate reasons to reject the opinion of the consultative examiner, Dr. Sial.  (See J. Mot. at 26–30, 34–35.) Plaintiff states that Dr. Sial opined that Plaintiff can sit for two hours in an eight-hour workday, stand and/or walk for up to two hours in an eight-hour workday, and must alternate sitting and standing periodically.  (Id. at 25–26 (citing AR at 307–08).)  Plaintiff contends that Dr. Sial's opinion demonstrates that Plaintiff is not able to work an eight-hour day on a sustained basis because she can sit at most two hours per day, and stand and walk for at most two hours per day, for a "combined total of four hours."  (J. Mot. at 26.)  Plaintiff also states that VEs testified during Plaintiff's administrative hearings that

---

[13]  To the extent the ALJ discounted Plaintiff's subjective symptom testimony because he concluded that Plaintiff's treatment was "conservative," as discussed above, this reason was not a clear and convincing reason.  See supra n.12.

a claimant with the RFC, as assessed by Dr. Sial, would not be able to work an eight-hour workday.  (Id. (citing AR at 660, 731, 741).)  Plaintiff therefore argues that the ALJ committed a reversible error by discounting Dr. Sial's opinion.  (See J. Mot. at 26–30.)

Defendant asserts that the ALJ properly rejected Dr. Sial's opinion.  (Id. at 30–34.)  Defendant contends that the ALJ sufficiently explained why he afforded little weight to Dr. Sial's opinion regarding Plaintiff's sitting limitation.  (Id. at 30–32.)  Defendant also argues that the ALJ's assessment of Dr. Sial's opinion is consistent with the regulations and supported by substantial evidence.  (Id. at 34.)

## 2.  Applicable law

Under the regulations governing claims filed before March 27, 2017, such as the claim in this case,[14] "[o]pinions from treating physicians receive more weight than opinions from examining physicians, and opinions from examining physicians receive more weight than opinions from non-examining physicians."  Farlow v. Kijakazi, 53 F.4th 485, 488 (9th Cir. 2022) (citation omitted); see also Perez v. Saul, 855 F. App'x 365, 366 (9th Cir. 2021) (providing that an examining physician's opinion must be given greater weight than the opinion of a non-examining physician).  "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citing Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Id.  "The opinion of a non-

---

[14]  The rule giving deference to a claimant's treating and examining physicians does not apply to claims filed on or after March 27, 2017.  See 20 C.F.R. § 416.920c(a) (providing that under the new regulations, the Commissioner "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) . . . including those from [the claimant's] medical sources" for claims filed on or after March 27, 2017).  Instead, certain factors are to be considered in evaluating the record.  See 20 C.F.R. § 416.920c(b)–(c).  Plaintiff filed her application for disability insurance benefits before March 27, 2017, and the changes to the rule therefore do not apply in this case.

examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician; such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record." Maye v. Kijakazi, Case No.: 22CV1326-BLM, 2023 WL 4364890, at *3 (S.D. Cal. July 5, 2023) (quoting Townsend v. Colvin, No. SACV 13–402–JEM, 2013 WL 4501476, *6 (C.D. Cal. Aug. 22, 2013)).

### 3. Analysis

On February 5, 2014, Social Security Administration's consultative medical examiner, Dr. Sial, conducted an internal medicine examination of Plaintiff to address Plaintiff's complaints of "[l]eft buttock and sacral pain." (AR at 303–09.) He assessed the following limitations: "[s]itting (with normal breaks) can be done [for] two hours. Outside of the normal break periods, [Plaintiff] must periodically alternate sitting and standing to relieve pain/discomfort." (Id. at 308.)

The ALJ acknowledged Dr. Sial's finding that Plaintiff can sit for two hours in an eight-hour day and stated the following:

> Dr. Sial's opinion as to the limitation on sitting was afforded minimal weight. First, he placed too much weight on subjective complaints of the claimant including her history that she could only sit for two hours. Second, his conclusions were inconsistent with his exam which showed that she could move about the office without assistance; her arms and legs were both within normal limits; she had a full range of motion of the neck without tenderness; she had a full range of motion of the thoracic spine without tenderness; negative straight leg raising test; five out of five strength in all extremities; and normal sensation (Exh. 7F). Dr. Sial noted what he perceived as an abnormal gait due to the claimant's allegations of sacral pain and left buttock pain that allegedly affected her gait (Exh. 7F, at pg. 5). However, there was no objective basis for limiting the sitting to two-hours. For instance, the claimant had negative straight leg raise results in both the sitting and supine positions (Exh. 7F, at pg. 4). The conclusions of Dr. Sial were also inconsistent with two closely contemporaneous exams on May 21, 2014, where there was a normal neurological and musculoskeletal examination results with normal gait by Michelle Jiu, M.D. (Exh. 13F, at pg. 30) and another normal neurological exam on May 28, 2014, by Eric Macy, M.D. (Exh. 13F, at pg. 33). In addition, the undersigned agreed with

Dr. Pong [sic] in which he found Dr. Sial's opinions too restrictive in light of the normal range of motion of all extremities and neck and back without spasm, negative straight leg raise test results, five out of five strength throughout, and normal sensation (Exh. 4A, at pg. 9).

(Id. at 680.)

Accordingly, the ALJ discounted Dr. Sial's opinion that Plaintiff can sit (with normal breaks) for up to two hours in an eight-hour workday.  (See id.; see also id. at 308.)  Dr. Pong, a state agency medical consultant, determined that Plaintiff can sit with normal breaks for six hours in an eight-hour workday.[15]  (Id. at 61.)  Because the opinion of Plaintiff's examining physician, Dr. Sial, with respect to Plaintiff's ability to sit is contradicted by the opinion of non-examining medical consultant, Dr. Pong, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record to discount Dr. Sial's opinion.  See Perez, 855 F. App'x at 366 (providing that an examining physician's opinion must be given greater weight than the opinion of a non-examining physician, and even if the opinion of an examining physician is contradicted by another physician, it "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.").

The ALJ assigned "minimal weight" to Dr. Sial's opinion, reasoning that Dr. Sial "placed too much weight" on Plaintiff's subjective complaints that she could only sit for two hours.  (AR at 680.)  If a physician's opinion is based "to a large extent on an applicant's self-reports and not on clinical evidence," and the ALJ finds the applicant not credible, the ALJ may discount the opinion.  Ghanim, 763 F.3d at 1162 (citation omitted).  "However, when an opinion is not more heavily based on a patient's self-

---

[15]  The Court notes that on October 20, 2021, a different consultative examiner, Dr. Tran, opined that Plaintiff could for sit six hours during an eight-hour workday.  (AR at 2404.)  The ALJ gave little weight to Dr. Tran's opinion, because his exam of Plaintiff "occurred long after the date last insured."  (Id. at 680.)

reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." Id.

As an initial matter, Dr. Sial specifically stated in his findings that Plaintiff "was deemed a credible historian" and did not exaggerate her symptoms. (AR at 303.) Further, before formulating his opinion, Dr. Sial reviewed Plaintiff's medical records, summarized "history of allegations" and "past medical history," and conducted physical, cervical spine, "thoracolumbar spine," and neurological examinations of Plaintiff. (See id. at 303–09.)

In a recent decision, a district court considered whether the ALJ properly evaluated a consultative examiner's opinion that plaintiff could not sit for more than six hours, stand for more than four hours, walk for more than four hours, and needed a cane to ambulate, where the ALJ discounted the consultative examiner's opinion, in part, because the examiner heavily relied on plaintiff's subjective report of symptoms and limitations. Kendall v. Comm'r of Soc. Sec. Admin., No. CV-21-00825-PHX-JJT, 2023 WL 2754003, at *4–5 (D. Ariz. Mar. 1, 2023). The court reasoned as follows:

> While it is true [p]laintiff's reporting of symptoms (i.e., pain) played a significant role in [consultative examiner's] assessments, it is not clear [the consultative examiner] similarly relied on [p]laintiff's reporting of his limitations (e.g., walking, sitting, standing) in formulating his own. Further, it would logically follow that because assessments of pain rely, at least in part, on self-reporting, [the consultative examiner] basing his opinion, at least in part, on [p]laintiff's self-reporting of pain cannot be the sole reason to reject such an opinion.

Id. The court concluded that the ALJ improperly discounted the consultative examiner's opinion because it was based not only on plaintiff's self-reports, but also on the examiner's review of plaintiff's medical records, and the examiner's physical examinations, tests, and diagnoses. Id.

Just as the consultative examiner in Kendall, who considered plaintiff's medical records, tests, diagnoses, and physical examinations, in addition to plaintiff's self-reports, in this case, Dr. Sial's opinion was based on his extensive review of Plaintiff's medical

33

records, and Dr. Sial's physical, cervical spine, "thoracolumbar spine," and neurological examinations of Plaintiff, as well as Plaintiff's self-reports.  Id.; (see also AR at 303–09). As such, the record demonstrates that Dr. Sial's opinion was based upon his examinations of Plaintiff, and not merely on Plaintiff's subjective complaints.  Dr. Sial's opinion therefore is "not more heavily based on [Plaintiff's] self-reports than on [Dr. Sial's] clinical observations."  See Ghanim, 763 F.3d at 1162 ("[W]hen an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion.").  Accordingly, this is not a specific and legitimate reason to discount Dr. Sial's opinion.  See id.; see also Gregory C. v. Comm'r, Soc. Sec. Admin., 426 F. Supp. 3d 660, 675 (D. Or. 2019) ("[B]ecause the ALJ's credibility determination is in error, the fact that [plaintiff's physician's] limitations are based to some extent on [p]laintiff's self-reports is not a specific and legitimate reason for rejecting [the physician's] opinion."); Allen R., 2021 WL 4468922, at *8 (finding that a physician's reliance on plaintiff's self-reports was not a specific and legitimate reason to reject the physician's opinion, where the record reflected that the physician's finding at issue was based upon his physical examination results, and not only on plaintiff's subjective complaints).

The ALJ also found that Dr. Sial's assessed limitation on Plaintiff's ability to sit was inconsistent with Dr. Sial's examination findings, reasoning that "there was no objective basis for limiting the sitting to two-hours."  (AR at 680.)  The ALJ cited Dr. Sial's examination findings that Plaintiff was able to move around the office without assistance, her arms and legs were within normal limits, she had a full range of motion of the neck and thoracic spine without tenderness, negative straight leg raising test, 5/5 strength in all extremities, and normal sensation.  (Id. (citing id. at 303–09).)  As Plaintiff correctly notes in her motion, a person's limited ability to sit does not require an "abnormal arm and leg examination; a full range of motion of the neck or thoracic spine (especially since [Plaintiff] did not allege any neck or thoracic spine pain); nor strength or sensation."  (See J. Mot. at 27–28.)  Further, Plaintiff's ability to move around Dr. Sial's

office without assistance does not bear on her ability to sit during a prolonged period of time.  Notably, Dr. Sial not only reviewed Plaintiff's medical records and examined Plaintiff; his examination also included "observation of [Plaintiff's] movements in the examination room and ability to get on and off the examination table."  (See AR at 303–09).  Additionally, Dr. Sial's neurological examination revealed that Plaintiff "ambulate[d] with an abnormal gait due to sacral pain."  (Id. at 307.)  A careful review of the record does not support a conclusion that Dr. Sial's assessed limitation on Plaintiff's ability to sit was inconsistent with his examination findings; rather, contrary to the ALJ's conclusion, Dr. Sial's examination findings substantiated his opinion.  Accordingly, Dr. Sial's examination findings do not provide a specific and legitimate reason for discrediting his opinion.

The ALJ also discounted Dr. Sial's opinion by citing (1) Dr. Jiu's May 21, 2014 examination notes, documenting normal neurological and musculoskeletal examination findings with normal gait, (id. at 680 (citing id. at 471)), and (2) Dr. Macy's May 28, 2014 examination notes, containing a normal neurological examination finding, (id. (citing id. at 474)).  As an initial matter, although both physicians examined Plaintiff, neither physician addressed Plaintiff's physical limitations resulting from her chronic pain.  (See id. at 470–76.)  Further, the ALJ mischaracterized the nature of Dr. Jiu's appointment with Plaintiff, which was to "establish new patient" and "PCP bonding," (id. at 470), and focused on Plaintiff's allergic rhinitis, (id. at 471–73), and not on conducting neurological and musculoskeletal examination of Plaintiff.  The ALJ also failed to acknowledge or discuss Dr. Jiu's extensive comments on Plaintiff's history of chronic pain.  (See id. at 680; see also id. at 471.)  Additionally, Dr. Jiu's finding of "normal gait" during a PCP bonding encounter does not contradict Dr. Sial's specific restrictions on Plaintiff's ability to sit.  (See id. at 308, 471.)  Similarly, during his appointment, Dr. Macy focused on Plaintiff's "rhinitis" and "throat clearing," and not on Plaintiff's physical limitations.  (See id. at 474.)  Therefore, the treatment notes the ALJ cited do not provide specific and legitimate reasons for discounting Dr. Sial's opinion because these

cherry-picked findings do not reflect the nature of Plaintiff's appointments with Drs. Jiu and Macy, and Plaintiff's diagnostic record as a whole.  See Reddick, 157 F.3d at 723 (finding that the ALJ's determination was not supported by substantial evidence, in part, because "the ALJ developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports"); see also Beatriz B., 2020 WL 4035450, at *7 (quoting Jarrett v. Colvin, NO. C15-5176-BHS-JPD, 2015 WL 9647627, at *4 (W.D. Wash. Nov. 30, 2015)) ("An ALJ may not 'cherry pick' from the record to support a conclusion, but must account for the context of the record as a whole. . . . Impermissible cherry-picking is therefore an issue of evidentiary support: an ALJ may not simply cite isolated pieces of evidence as support for a conclusion, without taking into account the record as a whole."); Fanlo v. Berryhill, Case No.: 17cv1617-LAB (BLM), 2018 WL 1536732, at *10 (S.D. Cal. Mar. 28, 2018) (citation omitted) ("The ALJ is not permitted to 'cherry-pick' only the records that support her position.").

To the extent the ALJ relied on the findings of non-examining, non-treating agency physician, Dr. Pong, who imposed less restrictive limitation on Plaintiff's ability to sit, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." Hill v. Astrue, 698 F.3d 1153, 1160 (9th Cir. 2012) (citation omitted); 20 C.F.R. § 404.1527(c)(2) (stating that more weight is given "to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]"); see also Kendall, 2023 WL 2754003, at *6 (citing Orn, 495 F.3d at 632) (finding that a state-agency medical consultants' opinion, standing alone, did not provide substantial evidence for the ALJ's decision to reject the opinions of plaintiff's consultative examiner and primary care provider).  Further, as the ALJ acknowledged in his written opinion, "Dr. Pong ha[d] not had access to [Plaintiff's] medical records since 2014, which made the opinion limited in value." (AR at 680.)  The ALJ also determined that Dr. Pong's opinion "vastly overestimated [Plaintiff's] abilities."  (Id.)  The ALJ, nevertheless, "agreed" with Dr.

Pong's opinion that Plaintiff can sit for six hours in an eight-hour day, and used Dr. Pong's opinion to discount Dr. Sial's more restrictive opinion that Plaintiff can only sit two hours during a workday.  (Id. (citing id. at 61).)

Notably, Dr. Sial's opinion was consistent with the opinion of Plaintiff's treating physician, Dr. Rosen, who opined that Plaintiff can sit for less than two hours in an eight-hour workday.  (Id. at 1085–87; see also id. at 1086–87 (containing Dr. Rosen's opinion that Plaintiff would need to take unscheduled breaks every two-to-four hours during an eight-hour workday, rest for twenty-to-thirty minutes before returning to work, and that she would likely be "absent from work as a result of [her] impairment or treatment" more than four days per month).)  Additionally, the ALJ also failed to acknowledge or discuss the imaging evidence in the record, which showed abnormalities and degeneration in Plaintiff's sacral area.  (See id. at 447–50, 1048–51.)

 The ALJ did not explain why the opinion of Plaintiff's examining physician, Dr. Sial, which was consistent with the opinion of Plaintiff's treating physician, Dr. Rosen, was entitled to less weight than the opinion of non-examining, non-treating medical consultant, Dr. Pong.  The ALJ's finding is especially troubling because Dr. Pong did not have access to Plaintiff's complete medical records, which, in the ALJ's own words, made the opinion "limited in value."  (Id. at 680.)  Accordingly, the ALJ's selective medical record citation and conclusory finding does not set forth the requisite specific and legitimate reasons that are supported by substantial evidence for discounting Dr. Sial's opinion.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (providing that the ALJ is required to set out a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] [his] interpretation thereof, and mak[e] findings"); Farlow, 53 F.4th at 488 (providing that "opinions from examining physicians receive more weight than opinions from non-examining physicians").

Considering the record as a whole, and for the reasons stated above, the Court finds that the ALJ did not provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Sial's opinion that Plaintiff can sit (with normal

breaks) for up to two hours in an eight-hour workday.  The ALJ therefore failed to properly evaluate Dr. Sial's opinion.

**C.    <u>The ALJ's errors were not harmless</u>**

An error is harmless if it is inconsequential to the ALJ's ultimate nondisability determination.  <u>See</u> <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1007 (9th Cir. 2015) (finding that the ALJ's error was harmless because it was "inconsequential to the ultimate nondisability determination."); <u>Tommasetti</u>, 533 F.3d at 1038 (internal quotation marks and citation omitted) ("[H]armless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.").

During Plaintiff's last administrative hearing on February 7, 2022, the ALJ posed the following hypothetical to the VE:

> It's opined that this hypothetical claimant can lift and carry ten pounds occasionally, less than ten pounds frequently.  Can stand or walk for up to two hours out of eight, sit for at least six.  Should never climb ropes, ladders, or scaffolds.  Can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  She should avoid[] concentrated exposure to extreme cold, vibration, unprotected heights and moving and dangerous machinery.

(AR at 747–48.)  The VE opined that a hypothetical individual with such limitations could return to past relevant work, but "not as [Plaintiff] always performed it, according to her testimony."  (<u>Id.</u> at 748.)  When posed with the same hypothetical, but with an additional restriction to sitting for four hours in an eight-hour workday, the VE opined that such an individual would not be able to perform Plaintiff's past relevant work, and that such individual's RFC would be considered less than sedentary.  (<u>Id.</u> at 748–49.) Finally, when the VE was asked whether the individual from the first hypothetical was limited to unskilled work because of pain and medication, the VE opined that such an individual would not be able to perform Plaintiff's past relevant work.  (<u>Id.</u> at 749.) Notably, during Plaintiff's first administrative hearing on April 7, 2016, and the second administrative hearing on July 3, 2019, different VEs testified that an individual with the

same RFC as assessed by Dr. Sial would not be able to work an eight-hour workday and there would not be any jobs available for such individual.  (See id. at 660–61, 727–31.)[16]

The ALJ discounted Plaintiff's testimony regarding her symptoms, as well as Dr. Sial's opinion that limited Plaintiff to sitting (with normal breaks) to two hours in an eight-hour day.  (See id. at 308.)  The ALJ did not incorporate Plaintiff's subjective

---

[16]  Specifically, during the first administrative hearing on April 7, 2016, the ALJ posed the following hypothetical to the VE:

> Q  [The] hypothetical is based on Exhibit 7F in the file which is the CE [consultative examiner's] evaluation. . . . Th[e] individual can occasionally lift 20 pounds, frequently lift 10 pounds.  This person can stand and walk for two hours in a normal eight-hour workday with normal breaks.  This person can sit two hours out of an eight-hour day.  Outside of the normal work periods, the [person] must periodically alternate sitting and standing to relieve pain and discomfort; can occasionally climb ramps, stairs, ladders, ropes and scaffolds; can occasionally stoop, kneel, crouch and crawl.  Based on that hypothetical, would this person be able to return to past work?
> A  No.
> Q  Any jobs?
> A  No.

(AR at 660 (emphases added).)

During Plaintiff's second administrative hearing on July 3, 2019, the VE was posed the following hypothetical:

> Q  So I'm just going to read directly from [Dr. Sial's] opinion.  The claimant can lift and carry—and/or carry 20 pounds occasionally and 10 pounds frequently.  Pushing and/or pulling were not limited other than for lift and carry.  Standing and/or walking with normal breaks can be done for up to two hours in a normal eight-hour workday. . . . [M]edically acquired handheld device is not required.  Sitting can be done for two hours with normal breaks.  Outside of normal breaks, the claimant must periodically alternate between standing and sitting to relieve pain and discomfort.  With that—the way that that opinion  was just described, would the individual be employable?
> . . . .
> [T]he standing and/or walking can be done for up to two hours and sitting can be done for two hours, which my reading of it is less than an eight-hour workday.
> A  So if that were the hypothetical, then no, they would not be able to perform past work.

(Id. at 730–31 (emphases added).)

symptom testimony and Dr. Sial's limitation on Plaintiff's ability to sit in his RFC determination.  Specifically, the ALJ's assessed RFC limited Plaintiff to sitting for at least six hours in an eight-hour workday, (id. at 820), and did not include the additional restriction assessed by Dr. Sial regarding Plaintiff's ability to sit for up to two hours in an eight-hour workday.  The ALJ ultimately concluded that Plaintiff could perform her past relevant work.  Different VEs testified during Plaintiff's three separate administrative hearings in this case that an individual with the same RFC as assessed by Dr. Sial would not be able to return to Plaintiff's past relevant work and work during an eight-hour workday.  The ALJ therefore erred by discounting Dr. Sial's opinion with respect to Plaintiff's sitting limitation and this error was not harmless.  See Tommasetti, 533 F.3d at 1038 (internal quotation marks and citation omitted) ("[H]armless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination"); Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007) (providing that errors that do not affect the ultimate result are harmless); see also Gomez, 2018 WL 3019935, at *11 (finding that the ALJ erred by discounting plaintiff's subjective symptom testimony and the error was not harmless, where the ALJ "did not accommodate th[e] subjective symptom testimony in [plaintiff's] RFC determination").  The Court therefore finds that reversal is warranted.

## VII.  REMEDY

Plaintiff moves the Court to reverse the Commissioner's decision and award benefits, or—in the alternative—remand the Commissioner's decision for further proceedings.  (J. Mot. at 18–19, 35.)  Defendant asks the Court to affirm the Commissioner's decision, or alternatively remand the case for further proceedings.  (Id. at 36.)

The reviewing court may enter a judgment "affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  Id.

Having found that the ALJ's decision must be reversed, the Court next needs to determine whether a remand for further proceedings, or a remand for payment of benefits, is appropriate.  The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  Id.; Treichler, 775 F.3d at 1099.  A remand for an immediate award of benefits is appropriate only in rare circumstances.  See Brown-Hunter, 806 F.3d at 495.  "[T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)).  Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  Ghanim, 763 F.3d at 1021.

Courts have acknowledged the "tremendous financial difficulties" that disabled claimants have "while awaiting the outcome of their appeals and proceedings on remand."  Benecke, 379 F.3d at 595 (citation omitted).  In this case, Plaintiff filed her application for benefits in February 2013, and has been waiting for the resolution of the case for over ten years.  (See AR at 126–27.)  Two ALJs have since considered Plaintiff's application on three separate occasions.  (Id. at 20–37; id. at 812–30; id. at 668–89.)

Based on the record before it, the Court finds that an award of benefits under credit-as-true rule is justified.  First, as discussed in detail in this Order, the ALJ failed to provide legally sufficient reasons to reject Plaintiff's subjective symptom testimony and the opinion of Plaintiff's consultative examiner, Dr. Sial.  See Benecke, 379 F.3d at 593.

Second, the record has been fully developed, and includes over 2,430 pages of medical records, diagnostic findings, opinions from Plaintiff's treating and examining

physicians, and state medical consultants, records of court proceedings, proceedings on multiple remands, and transcripts from three hearings held by two ALJs.  The transcripts include Plaintiff's extensive testimony, as well as testimony by three different VEs who all opined that the limitations assessed by Dr. Sial would preclude work entirely.  Further, when Plaintiff's subjective symptom testimony and Dr. Sial's opinion are given appropriate weight, the testimony from the multiple VEs consistently confirms that Plaintiff cannot perform her past relevant work.  Crediting the rejected evidence, the ALJ should have formulated a correct RFC and concluded at step four of his sequential evaluation process that Plaintiff cannot perform her past relevant work.

The Court then needs to determine whether it should remand for further administrative proceedings as to step five, where the Commissioner bears the burden of proving that Plaintiff can perform other work that exists in significant numbers in the national economy, considering Plaintiff's RFC, age, education, and work experience.  See 20 C.F.R. § 404.1560(c)(1)–(2); 20 C.F.R. § 404.1520(g)(1).  This issue, however, has already been addressed because the record contains VE's testimony that a hypothetical person with limitations on sitting, as well as standing and walking, as assessed by Dr. Sial, would not be able to perform other work in the national economy.  (See AR at 660.)  Accordingly, the record is fully developed, and there is no need to remand for further administrative proceedings as to step five.  See Benecke, 379 F.3d at 593 ("[W]here the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."); Beatriz B., 2020 WL 4035450, at *9 (reversing the Commissioner's denial of disability insurance benefits and remanding to the ALJ for the calculation and award of benefits, where the court concluded that the ALJ erred by rejecting the opinions of plaintiff's treating physician, and where plaintiff's testimony, the discounted opinion of plaintiff's treating physician, and VE testimony established that plaintiff could not perform her past relevant work, as well as other work in the national economy; concluding that the record was fully developed, and that there was no need to remand for further administrative

1  proceedings as to step five).  As such, there are no outstanding issues that require further

2  proceedings.  See Benecke, 379 F.3d at 593; see also Rose v. Berryhill, 256 F. Supp. 3d

3  1079, 1091 (C.D. Cal. 2017) (finding record complete where it included hundreds of

4  pages of medical records, several medical opinions, and transcripts from two hearings

5  including testimony from plaintiff, two doctors, and two VEs).

6         Third, when the improperly discredited evidence is credited as true, the ALJ would

7  be compelled to find Plaintiff disabled on remand.  See Benecke, 379 F.3d at 593.

8         Accordingly, the evidence provided by Dr. Sial's assessed limitations and

9  Plaintiff's subjective symptom testimony is credited as true.  For the reasons stated

10  above, and because the record as a whole does not create "serious doubt" as to whether

11  Plaintiff is disabled, the Court exercises its discretion to remand this case for an award of

12  benefits.  See Ghanim, 763 F.3d at 1021; see also Perez, 855 F. App'x. at 370 (reversing

13  the district court's judgment affirming the denial of benefits with instructions to remand

14  to the Commissioner of Social Security for the calculation and award of benefits, where

15  the ALJ committed a reversible error by discounting the claimant's symptom testimony,

16  and the opinions of his treating and examining physicians, and where the evidence in the

17  record included medical history describing the claimant's multiple treatments and

18  procedures, notes from doctors' appointments, emergency room visits, therapy, opinions

19  from treating, examining, and non-examining physicians, and extensive testimony from

20  the claimant; concluding that if the ALJ had credited the evidence, the ALJ would be

21  required to find that the claimant was disabled and there was "no useful purpose in

22  remanding for further proceedings"); Newton v. Saul, 839 F. App'x 178, 179 (9th Cir.

23  2021) (reversing the district court's opinion affirming the denial of benefits and

24  remanding to the district court with instructions to remand to the ALJ for the calculation

25  and award of benefits, where the ALJ committed a reversible error by discounting the

26  claimant's symptom testimony and the opinions of the claimant's treating and examining

27  physicians; concluding that "the record is complete, no legally sufficient evidence casts

28  doubt on [c]laimant's disability, and [c]laimant first sought benefits seven years ago");

<u>Campbell v. Saul</u>, 834 F. App'x 330, 332–33 (9th Cir. 2021) (reversing district court opinion affirming the denial of benefits and remanding to the district court with instructions to remand to the Commissioner of Social Security for an award of benefits, where the claimant's treating physician opined that the claimant would miss more than four days of work per month and the VE had opined that no jobs existed for an individual with the claimant's limitations); <u>Albert B. v. Kijakazi</u>, Case No. 5:22-cv-00865-EJD, 2023 WL 6462856, at *7–8 (N.D. Cal. Sept. 29, 2023) (remanding for calculation and award of benefits, where the case had been previously remanded for further administrative proceedings; the ALJ failed to provide legally sufficient reasons for rejecting the uniform medical evidence; the record was fully developed and included medical records, court proceedings, and medical expert testimony; and the court concluded that if the improperly discredited evidence were credited as true, the ALJ would be compelled to find plaintiff disabled).

## VIII.  CONCLUSION

For the reasons stated above, the Court **REVERSES** the Commissioner's decision. The case is **REMANDED** to the Commissioner for the **CALCULATION AND AWARD OF BENEFITS**.

**IT IS SO ORDERED.**

Dated:  February 6, 2024

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge